

**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-254-3600

January 14, 2015

Mr. Lance McDermott
1819 S. 104th Street
Seattle, WA 98168

Re: OSC File No. HA-15-0930

Dear Mr. McDermott:

The U.S. Office of Special Counsel (OSC) has completed its review of your allegations that unnamed employees of the U.S. Postal Service (USPS) violated the Hatch Act. As explained below, we are closing our file without further action.

The Hatch Act (5 U.S.C. §§ 7321-7326) governs the political activity of federal executive branch employees, including USPS employees. *See* 39 U.S.C. § 410. The Act permits most covered employees to actively participate in partisan political management and partisan political campaigns. Employees, however, are prohibited from: using their official authority or influence for the purpose of affecting the result of an election; knowingly soliciting, accepting, or receiving political contributions from any person; being candidates for public office in partisan elections; and knowingly soliciting or discouraging the political activity of any individual with business before their employing office. 5 U.S.C. § 7323(a)(1)-(4). The Hatch Act also prohibits employees from engaging in political activity while on duty, in a government building, while wearing an official uniform or insignia, or using a government vehicle. 5 U.S.C. § 7324.

You allege that USPS officials have violated the Hatch Act by providing discounts for political mailings. You do not allege that USPS has given discounts to one political party over others, but rather that providing discounts for all political mailings constitutes a direct contribution of USPS revenue to political parties, in violation of the Hatch Act.

OSC considered your allegations but has concluded that USPS's providing of discounts for all political mailings does not fall within the prohibitions of the Hatch Act, as outlined above. Accordingly, we are closing our file in this matter without further action.

Sincerely,

*Erica S. Hamrick*

Erica S. Hamrick
Deputy Chief
Hatch Act Unit



# STATE OF WASHINGTON
# PUBLIC DISCLOSURE COMMISSION

711 Capitol Way Rm. 206, PO Box 40908 • Olympia, Washington 98504-0908 • (360) 753-1111
Toll Free 1-877-601-2828 • E-mail: pdc@pdc.wa.gov • Website: www.pdc.wa.gov

May 28, 2015

Lance McDermott
1819 S 104th St
Seattle WA 98168

Subject: Your complaint regarding the United States Postal Service, Tracking No. T15-117

Dear Mr. McDermott:

On May 28, 2015, the Washington State Public Disclosure Commission (PDC) received a complaint from you alleging potential violations of RCW 42.17A or WAC 390 by the United States Postal Service (USPS). You alleged that USPS broke the Hatch Act by supporting political campaigns by providing candidates and their associated organizations with bulk mail discounts. Your complaint has been assigned the tracking number T15-117.

After reviewing the documents and materials you provided, the PDC is unable to respond to the issues you raised because they do not fall within the Commission's jurisdiction. The commission does not have jurisdiction to investigate or take action on issues related to candidates or committees in federal elections. For this reason, PDC staff will close its initial review of this matter.

If you obtain additional information or documentation clearly demonstrating a reason to believe that a violation of RCW 42.17A or WAC 390 has occurred, please forward those items to PDC staff for review. If you have questions about the PDC complaint review process, you may contact Phil Stutzman at (360) 664-8853, toll-free at 1-877-601-2828, or by e-mail at phil.stutzman@pdc.wa.gov.

Sincerely,

Philip E. Stutzman
Director of Compliance

c:   USPS

# Permitted and Prohibited Activities for Employees Who May Engage in Partisan Activity

- May be candidates for public office in nonpartisan elections
- May register and vote as they choose
- May assist in voter registration drives
- May express opinions about candidates and issues
- May contribute money to political organizations
- May attend political fundraising functions
- May attend and be active at political rallies and meetings
- May join and be an active member of a political party or club
- May sign nominating petitions
- May campaign for or against referendum questions, constitutional amendments, municipal ordinances
- May campaign for or against candidates in partisan elections
- May make campaign speeches for candidates in partisan elections
- May distribute campaign literature in partisan elections
- May hold office in political clubs or parties including serving as a delegate to a convention

- **May not** use their official authority or influence to interfere with an election
- **May not** solicit, accept or receive political contributions unless both individuals are members of the same federal labor organization or employee organization and the one solicited is not a subordinate employee
- **May not** knowingly solicit or discourage the political activity of any person who has business before the agency
- **May not** engage in political activity while on duty
- **May not** engage in political activity in any government office
- **May not** engage in political activity while wearing an official uniform
- **May not** engage in political activity while using a government vehicle
- **May not** be candidates for public office in partisan elections partisan elections
- **May not** wear political buttons on duty

4



# Title 5. United States Code

SUBCHAPTER III -- POLITICAL ACTIVITIES

### § 7321. Political participation

It is the policy of the Congress that employees should be encouraged to exercise fully, freely and without fear of penalty or reprisal, and to the extent not expressly prohibited by law, their right to participate or to refrain from participating in the political processes of the Nation.

### § 7322. Definitions

For the purposes of this subchapter -

(1) "employee" means any individual, other than the President and the Vice President, employed or holding office in --

(A) an Executive agency other than the General Accounting Office;

(B) a position within the competitive service which is not an executive agency; or

(C) the government of the District of Columbia, other than the Mayor or a member of the City Council or the Recorder of Deeds;

but does not include a member of the uniformed services;

(2) 'partisan political office' means any office which any candidate is nominated or elected as representing a party any of whose candidates for Presidential elector received votes in the last preceding election at which Presidential electors were selected, but shall exclude any office or position within a political party or affiliated organization;

(3) "political contribution" --

(A) means any gift, subscription, loan, advance, or deposit of money or anything of value, made for any political purpose;

(B) includes any contract, promise, or agreement, express or implied, whether or not legally enforceable, to make a contribution for any political purpose;

(C) includes any payment by any person, other than a candidate or a political party or affiliated organization, of compensation for the personal services of another person which are rendered to any candidate or political party or affiliated organization without charge for any political purpose; and

(D) includes the provision of personal services for any political purpose.

### § 7323. Political activity authorized; prohibitions

(a) Subject to the provisions of subsection (b), an employee may take an active part in political management or in political campaigns, except an employee may not --

(1) use his official authority or influence for the purpose of interfering with or affecting the result of an election;

(2) knowingly solicit, accept, or receive a political contribution from any person, unless such person is --

(A) a member of the same Federal labor organization as defined under section 7103(4) of this title or a Federal employee organization which as of the date of enactment of the Hatch Act Reform Amendments of 1993 had a multicandidate political committee (as defined under section 315(a)(4) of the Federal Election Campaign Act of 1971 (2 U.S.C. 441a(a)(4)));

(B) not a subordinate employee; and

(C) the solicitation is for a contribution to the multicandidate political committee (as defined under section 315(a)(4)of the Federal Election Campaign Act of 1971 (2 U.S.C. 441a(a)(4)))of such Federal labor organization as defined under section 7103(4)of this title or a Federal employee organization which as of the date of the enactment of the Hatch Act Reform Amendments of 1993 had a multicandidate political committee (as defined under section 315(a)(4)of the Federal Election Campaign Act of 1971 (2) U.S.C. 441a(a)(4))); or

(3) run for the nomination or as a candidate for election to a partisan political office; or

(4) knowingly solicit or discourage the participation in any political activity of any person who --

(A) has an application for any compensation, grant, contract, ruling, license, permit, or certificate pending before the employing office of such employee; or

(B) is the subject of or a participant in an ongoing audit, investigation, or enforcement action being carried out by the employing office of such employee.

(b)(l) An employee of the Federal Election Commission (except one appointed by the President, by and with the advice and consent of the Senate), may not request or receive from, or give to, an employee, a Member of Congress, or an officer of a uniformed service a political contribution.

(2)(A) No employee described under subparagraph (B) (except one appointed by the President, by and with the advice and consent of the Senate), may take an active part in political management or political campaigns.

(B) The provisions of subparagraph (A) shall apply to --

(i) an employee of --

(I) the Federal Election Commission;

(II) the Federal Bureau of Investigation;

(III) the Secret Service;

(IV) the Central Intelligence Agency;

(V) the National Security Council;

(VI) the National Security Agency;

(VII) the Defense Intelligence Agency;

(VIII) the Merit Systems Protection Board;

(IX) the Office of Special Counsel;

(X) the Office of Criminal Investigation of the Internal Revenue Service;

(XI) the Office of Investigative Programs of the United States Customs Service; or

(XII) the Office of the Law Enforcement of the Bureau of Alcohol, Tobacco, and Firearms; or

(XIII) the National Geospatial Intelligence Agency; or

(ii) a person employed in a position described under section 3132(a)(4) or 5372, 5372a, or 5372b of title 5, United States Code.

(3) No employee of the Criminal Division of the Department of Justice (except one appointed by the President, by and with the advice and consent of the Senate), may take an active part in political management or political campaigns.

(4) For purposes of this subsection, the term 'active part in political management or in a political campaign' means those acts of political management or political campaigning which were prohibited for employees of the competitive service



before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President.

(c) An employee retains the right to vote as he chooses and to express his opinion on political subjects and candidates.

### § 7324. Political activities on duty; prohibition

(a) An employee may not engage in political activity --
  (1) while the employee is on duty,
  (2) in any room or building occupied in the discharge of official duties by an individual employed or holding office in the Government of the United States or any agency or instrumentality thereof;
  (3) while wearing a uniform or official insignia identifying the office or position of the employee; or
  (4) using any vehicle owned or leased by the Government of the United States or any agency or instrumentality thereof.

(b)(1) An employee described in paragraph (2) of this subsection may engage in political activity otherwise prohibited by subsection (a) if the costs associated with that political activity are not paid for by money derived from the Treasury of the United States.

(2) Paragraph (1) applies to an employee --
  (A) the duties and responsibilities of whose position continue outside normal duty hours and while away from the normal duty post; and
  (B) who is --
    (i) an employee paid from an appropriation for the Executive Office of the President; or
    (ii) an employee appointed by the President, by and with the advice and consent of the Senate, whose position is located within the United States, who determines policies to be pursued by the United States in relations with foreign powers or in the nationwide administration of Federal laws.

### § 7325. Political activity permitted; employees residing in certain municipalities

The Office of Personnel Management may prescribe regulations permitting employees, without regard to the prohibition in paragraphs (2) and (3) of section 7323(a) and paragraph (2) of section 7323(b) of this title. to take an active part in political management and political campaigns involving the municipality or other political subdivision in which they reside, to the extent the Office considers it to be in their domestic interest, when --
  (1) the municipality or political subdivision is in Maryland or Virginia and in the immediate vicinity of the District of Columbia, or is a municipality in which the majority of the voters are employed by the Government of the United States; and
  (2) the Office determines that because of special or unusual circumstances which exist in the municipality or political subdivision it is in the domestic interest of the employees and individuals to permit that political participation.

### § 7326. Penalties

An employee or individual who violates section 7323 or 7324 of this title shall be removed from his position, and funds appropriated for the position from which removed thereafter may not be used to pay the employee or individual. However, if the Merit Systems Protection Board finds by unanimous vote that the violation does not warrant removal, a penalty of not less than 30 days' suspension without pay shall be imposed by direction of the Board.

13



MAILING SUCCESS

# Political Mail Payoff
## Cutburth Sells Direct to Oregon GOP!


Mailing to Win


Jamie Cutburth with political VDM letters

Oftentimes, to get the job done, you have to go to the top. That's what Portland District SSEM **Jamie Cutburth** found as he attempted to gain new political mail business in Oregon.

Cutburth reached out to both party leaders to discuss how mail could be an integral part of candidates' campaigns. The GOP chairman accepted his offer. Cutburth made the six-hour trip to southern Oregon to lay out his strategy to the state leader.

"I had the whole strategy laid out for him," says Cutburth. "I told him that we had a team of people who could help their candidates use the mail effectively in statewide races."

Cutburth put together a 5x5 presentation and showed the GOP leader how they could use the mail to grow their base and increase incremental funding. The chairman was impressed and wrote an endorsement letter that could be used for multiple races throughout the state.

While Cutburth focused on the statewide and congressional races, he referred local candidates to the Field Sales Representatives (FSR's). The FSR's in the office responded by sending the endorsement letter to key candidates. This allowed the Portland team to effectively cover candidates for most of the statehouse elections.

The biggest hurdle in each case: Handling the mixed messaging coming from highly paid national consultants who believed that mail had passed its prime.

"These folks will tell you that mail is old school—they wanted to use a combination of digital and TV to win the elections," says Cutburth. "My message to those candidates who followed consultant advice is that they always needed to be fundraising."

Since a lot of money was spent on the US Senate election in the state, many candidates had depleted their war chest toward the end of the election. In several cases, candidates had to go back to direct mail to raise money to finish the campaign strong. The strong push by the GOP captured the attention of Democratic candidates who also asked Cutburth how they could succeed with direct mail.

"We obviously have to be non-partisan," says Cutburth. "But if you have the general message that they need to be continuously fundraising and mail is the way to do it, that message resonates with candidates."

As a result of Jamie's effort, this opportunity totals approximately 2.3M pieces of Direct Mail with estimated new revenue for the Postal Service of $494,000!

Contact info: (503) 294-2336
james.h.cutburth@usps.gov



## Political Mail: Actual Spending
Through October 31   Source: PostalOne

| Area | Revenue | Volume |
|---|---|---|
| CAPITAL METRO | $ 42,969,503 | 209,409,040 |
| EASTERN | $ 39,469,867 | |
| GREAT LAKES | $ 45,946,331 | 232,288,791 |
| NORTHEAST | $ 38,533,441 | |
| PACIFIC | $ 85,741,266 | 411,939,978 |
| SOUTHERN | $ 60,222,419 | |
| WESTERN | $ 64,543,654 | 308,780,886 |
| TOTAL CYCLE | $ 377,426,482 | |

*Handwritten annotations: "5% discount", "209 409 040 / 42,969,503 = 20.5 Cents"*

# Policy, political lines blur when GOP mailer group wears 2 hats

BY DENNIS CONRAD
*The Associated Press*

WASHINGTON – When Republican members of Congress need literature to send out to constituents on their doings in office, dozens turn to a Utah firm that churns out slick, full-color mailers at taxpayer expense.

When they need political mailers designed to get them re-elected, some of them turn to the same people.

In theory, policy and politics are separate enterprises in Washington. In practice, they are joined at the hip.

The line between them may be blurred more than usual in the work done by sister companies with the same owners who produce franked constituent mail paid by the government, then switch to election propaganda paid by campaigns, just as an industrial plant retools its assembly line to meet changing demand.

Utah-based Arena Communications produces political direct mail for a number of House members, as well as the national Republican Party and other GOP candidates. Its sister company, the Franking Group, has collected millions of federal dollars for design and printing work for dozens of Republican House members, many of them the same as its political clients.

The two companies' ties could hardly be tighter: both are owned by the same three businessmen and they share a warehouse in Salt Lake City. And it's often hard to distinguish between the polished mailers printed on the taxpayers' dime and the election circulars produced and paid from political contributions.

House rules allow lawmakers to send federally financed mass mailings to

constituents as long as they're not intended to help in a re-election campaign or have some other partisan purpose.

"It only becomes tougher for lawmakers to insist there's no connection between official mail and their campaigns when the same mailing firm wears both hats," said Pete Sepp, executive vice president of the National Taxpayers Union. "They say they hold to partisan posts, do not coordinate non-political work with campaign organizations and see no legal or ethical problems with how they operate."

They say their companies do their jobs separately, and note that all government-financed mailings are reviewed by a bipartisan House commission to ensure they aren't political.

Out of legal necessity, the Franking Group becomes virtually inactive at the height of the campaign season. The House bars federally financed constituent mailings within 90 days of an election, and that's when lawmakers typically shift to their political campaigns to send out their mailings.

"The Franking Group basically goes dark as we focus on – as we then put on our hats and work on – the political world," said David Jacobs, its managing partner and co-owner. He, Peter Valcarce and James Ohman jointly own the companies.

It's only natural, they say, to work solely for members of one party.

"That strategy obviously reflects the nature of the House," said Valcarce, who more than a decade ago served briefly as an aide to Sen. Orrin Hatch, R-Utah, and soon helped found the Franking Group. "Staffers pick sides. Consultants pick sides. Everybody at one point has to pick a side."

The Franking Group's website identifies 64 House Republicans who have been clients and says there have been many more. House records show the firm was paid slightly more than $4 million

by the government during the 12-month period ended in June for work done on behalf of 60 House Republicans – about a third of the chamber's GOP membership.

Not only is the Franking Group the dominant direct-mail vendor for taxpayer-financed mailings directed by Republicans, it easily outpaces leading Democratic firms, according to a review of House records by The Associated Press.

The leading Democratic-oriented vendor received about $1.25 million in the same 12-month period. That company, Constituent Communications, LLC, also has ties to a political direct-mail firm.

U.S. Postal Service records show taxpayer-financed mailings from the Franking Group wind up in mail boxes all over the nation. For example, a Nov. 6 shipment of 69 containers with 100,255 pieces of mail went to Indiana for GOP Rep. Dan Burton.

Messages touted "Dan Burton's Fall Job Fair...Help get Indiana working again!" Such boosterism is common to the franked mail of members of both parties as lawmakers pitch their events, policies – and themselves – without overtly political salesmanship.

At least 19 of the Republicans named on the Franking Group website as clients also hired Arena Communications, typically for campaign mailings, in one or more of the election cycles since 2004, according to Federal Election Commission records.


**UNITED STATES POSTAL SERVICE**



# FY 2016 Political Mail National Sales Strategy

## Operation Lion's Share!
*Position, Prepare, Pursue*

### BACKGROUND

The 2016 political season will be a tremendous opportunity for the US Postal Service to increase mail volumes and revenue. It is expected that over $12.3B will be spent on advertising during the 2016 election cycle. The United States presidential election will occur on Tuesday, November 8, 2016.

At the national level:
- 2016 will feature the election of a new president; have all 435 seats of the House up for grabs and puts 34 seats in the U.S. Senate on the ballot.

At the state level:
- There are 11 state gubernatorial races being held (Montana, New Hampshire, North Carolina, Washington, Indiana, Delaware, Missouri, Vermont, West Virginia, North Dakota, and Utah) as well as in the territories of Puerto Rico and American Samoa.
- Races will be held in 43 states for state legislature seats along with a variety of state offices such as Secretary of State, Education, etc.

At the local level:
- Races for city and county offices will occur across the country.

Referendums, Ballot Initiatives & Constitutional Amendments
- In addition to candidate races, at the state and local level ballot initiatives and proposed constitutional amendments will be presented to voters.

In 2012, USPS overall election ad spending on Direct Mail was $525M. We increased share 2.3 basis points or 71% lift to 5% over the pundit predictions. Research firm Borrell Associates Inc. is predicting Direct Mail spending for 2016 to be $370.7M, 3.0% share of $12.3B.

The 2016 Sales goal of $1B is double what we did in 2012. We plan to gain our "lion's share" of media spend in 2016. It is expected that online, cable and radio will beat performance over 2012. Cable is expected to beat out broadcast due to cable's ability to target a specific audience.

2016 will see more political ad spending than the nation has ever generated, almost $51 for every qualified voter in the United States.





USPS® Mail: Talking Points for Political Mail

# How direct mail attracts voters and delivers results



USPS ★ Mail: *Talking Points for Political Mail*

**UNITED STATES POSTAL SERVICE**®

FOR INTERNAL USE ONLY

─────────────── ★ ★ ★ ───────────────

# Part 3: The big story—why direct mail is a win for political campaigns

Now that you know more about your prospective customers' political advertising tactics, direct mail knowledge and usage, and challenges and goals, you can customize your conversation and the benefits of direct mail as part of their campaign strategy.

This is where you can demonstrate that, whatever your customers' needs, concerns, or pain points, direct mail is an outreach component that can increase votes and win elections.

 *Direct mail can help you create a deeper connection with prospective voters because it's targeted, highly personalized, measurable, and engaging. It can also be more cost-effective. Integrating direct mail with digital advertising can also help extract key data by tracking voters' digital behavior.*

## Direct mail is the perfect platform for your customer's platform

In 2012, 2.8 billion political mailpieces were sent out. Direct mail is one of the most resilient and effective advertising channels for winning political campaigns. It is the proven backbone for launching omni-channel digital experiences and has the ability to micro-target voters and measure campaign results to leave a lasting impression.

Direct mail can also help emphasize fine distinctions between candidates. It also plays an important, integrated role with other advertising channels by supplementing gaps in coverage, reinforcing messages, and directing voters to digital properties.

**Highlight:** Be sure to emphasize that voter attention is constantly stretched across multiple technology devices. Direct mail is most successful when incorporated into an omni-channel political advertising campaign because it drives voters to digital experiences.

 Leverage the "The perfect platform for your platform" sell sheet as well as the "Direct mail delivers election upset with aggressive and targeted messaging" and "Direct mail delivers critical win with micro-targeted messaging" case studies.

## Digital integration

Integrating direct mail with digital technology enables real-time behavior tracking and more precise campaign measurement. Let your prospects know that the following technologies can be easily integrated with direct mail to create memorable voter impressions:

**Augmented reality (AR).** AR can transform direct mail into an interactive experience by triggering multimedia content that can only be viewed with a mobile or tablet device. It can be an effective way to engage Millennials who have grown up with technology devices and are more likely to use AR. When combined with direct mail, AR can guide customers to a website, social media, or other digital property to sign up for an e-newsletter, request further information, download an app, or watch a video.

 *After sending a holiday card with an augmented reality trigger, USPS found that responders launched the AR experience an average of 3.5 distinct times.*[1]






---  ★ ★ ★ ---

## Additional selling points

### The many benefits of direct mail for political campaigns

**Targeted messages.** Direct mail targeted to specific audiences allows for more hard-hitting messaging.

 *"Technology has empowered consumers and voters to choose what advertising they see. . . . Mail is the only remaining advertising medium that can reach every targeted voter."*

—Hal Malchow, award-winning political strategist and voter-targeting pioneer[1]

**Personal connections.** Information gathered through digital technology, big data, and cloud analytics can create direct mail that delivers hyper-targeted messages based on in-depth information like interests, previous voting habits, age, geography, ethnicity, issues and concerns, and recent online and offline behavior.

**Reach.** Mail reaches every household in the United States, 100% indexed. According to a USPS Household Diary Study, 79% of households read or scanned advertising mail sent to their household.[2]

**Flexibility.** Direct mail can range from postcards and brochures to more elaborate pieces depending on strategy and budget.

**Tangibility.** Physical mailpieces connect with voters on a sensory level to help tell a story, contrast candidates, and drive home campaign messages.

**Engagement with the senses.** Mail makes a more memorable impression by reaching recipients via imagery, textures, aromas, audio, and video.

**Trustworthiness.** Even as voters become more dependent on digital communication like email, texts, social media, and web content, they still value and trust the U.S. mail.

**Measurability.** Direct mail is the most trackable and measurable of all media.[3] It lets managers track the success of their campaigns to see what works and then make adjustments in the design, the message, or the target audience. Tracking can be as sophisticated as data modeling and list-level analysis.

**Cost-effectiveness.** As direct mail becomes more and more targeted and efficient, it can deliver better ROI than email and pay-per-click advertising.

 *"For an average of 50 cents a piece, you can get into the home of 100% of voters. You can't do that with a phone call or TV spot."*

—Joe Fuld, founder, The Campaign Workshop[4]

**Enhanced visibility and campaign integration.** The USPS® IMb® provides near real-time data on the status and timing of mailings as they progress through the postal system. Campaign consultants, advocacy groups, and mail houses can use this data to efficiently track their mailings and synchronize the timing with other campaign efforts such as Twitter events, live streaming speeches, canvassing, radio spots, and calls. This can help personalize direct mail campaigns on a market-by-market basis.

 Leverage "Direct Mail for Customer Acquisition" and "Best Practices for Successful Loyalty Programs" sell sheets and "How Direct Mail Can Help Businesses Attract Customers and Drive Sales" talking points.





USPS ★ Mail: *Talking Points for Political Mail*



1. Hal Malchow, *Political Direct Mail in the Digital Age: A Campaign Guide to Democratic Direct Mail*, The Campaign Workshop, 2014
2. *The Household Diary Study: Mail Use & Attitudes in FY 2012*, a private study funded by USPS, May 2013.
3. *2014 Statistical Fact Book*, Direct Marketing Association, 2014
4. Interview with Joe Fuld, founder of The Campaign Workshop, 2015

★ ★ ★

# Part 4: Big data can deliver big results

## Personalization is the key to influencing voter perception

Big data analytics can help personalize and amplify campaign messages, create a stronger call to act, and ultimately help to increase voter conversion rates.

 *54% of marketers report they have already started investing in some kind of big data solution, while another 30% report they will start in the next two years.*[1]

In addition, house mailing lists can help political campaigns reach target audiences by identifying voters with specific voting habits or profiles. To get the most bang for their buck, campaign managers need to determine the accuracy and "cleanliness" of their current data, develop tests, evaluate their overall media strategy, and measure the effectiveness of their campaigns with lists.

USPS offers Address Quality Analysis (AQA) to help make sure their house lists are accurate, up-to-date, and deliverable. This reduces mailing errors, saving them money and time.

 Leverage the "Big Data+ Direct Mail = Powerful Results" folder, "Merge Big Data Insights with Direct Mail to Boost Customer Engagement" talking points, and "Maximize Your Direct Mail Campaign" sell sheet.

## Direct mail is the right medium to target specific audiences

A big advantage of direct mail is that it can help micro-target specific audiences with customized messages to appeal to specific voter groups and swing voters. Here are some examples of the big data insights that can be used to target voters:

**Age.** 14,945,000 Millennials reported voting in 2014.[1] Young adults, 24 and younger, are among the most mail-responsive groups today.[2] Baby Boomers and older Gen Xers have the highest voting rates.[1]

**Gender.** In 2014, 43.0% of women surveyed reported voting (49,243,000) compared with 40.8% of men (43,009,000).[1]

**Ethnicity.** Reported voting rates include non-Hispanic Whites (45.8%), non-Hispanic Blacks (40.6%), non-Hispanic Asians (26.9%), and Hispanics (27.0%). Across the last three election cycles, the voting population has grown more racially and ethnically diverse.[1]

**Issue advocacy.** Direct mail can be personalized to target issues such as public safety, the economy, and environmental concerns as well as ballot measures and initiatives.

**Highlight:** When describing how direct mail creates powerful relationships with voters, make sure to include that mail can be effective throughout all parts of the political campaign.

Life cycle of a political campaign:

* Ongoing fundraising and volunteer recruitment
* Persuasion communications
* Voter mobilization
* Define and attack opponent
* GOTV

 Leverage the "Direct mail delivers critical win with micro-targeted messaging" and "Direct mail delivers election upset with aggressive and targeted messaging," case studies, "The perfect platform for your platform" sell sheet, and "The perfect platform for your platform" infographic for an in-depth discussion about how direct mail can integrate into all parts of the political campaign process.

---

1. Thom File, *Who Votes? Congressional Elections and the American Electorate: 1978-2014*, U.S. Census Bureau, July 2015.
2. *2014 Statistical Fact Book*, Direct Marketing Association, 2014.

FOR INTERNAL USE ONLY



U.S. POSTAL SERVICE
# Sales Communications – News You Can Use

April 9, 2014

# Campaign 2014 Alert: Advocacy Groups Influence Elections

*National Postal Forum NPF*
*501(c)(3)*

**Weeks to Election: 31**

Advocacy groups will play a major role in this year's elections. There are 5 types of advocacy groups: 501c, 527, Non-Federal, Political Action Committees (PACs), and the Super PACs. The definition of each advocacy group is provided below according to the **Center for Responsive Politics.**

**501c Groups** are nonprofit, tax-exempt groups organized under section 501(c) of the Internal Revenue Code that can engage in varying amounts of political activity, depending on the type of group. Examples of 501c are:
- 501(c)(3): Operate for religious, charitable, scientific or educational purposes.
- 501(c)(4): Commonly called "social welfare" organizations that may engage in political activities, as long as these activities do not become their primary purpose.
- 501(c)(5): Labor and agricultural groups
- 501(c)(6): Business leagues, chambers of commerce, real estate boards and boards of trade.

**527 Groups** are tax-exempt groups organized under section 527 of the Internal Revenue Code to raise money for political activities including voter mobilization efforts and issue advocacy. Many 527s run by special interest groups raise unlimited "soft money," which they use for voter mobilization and certain types of issue advocacy. They do not support efforts that expressly advocate the election or defeat of a federal candidate.

**Non-Federal Groups** are groups set up to raise unlimited contributions called "soft money," which they spend on voter mobilization efforts and so-called issue ads that often criticize or tout a candidate's record just before an election in an effort to influence the election's outcome. 501(c) groups and 527 groups may raise non-federal funds.

**Political Action Committee (PAC)** is a political group that raises and spends limited "hard" money contributions for the express purpose of electing or defeating candidates. Organizations that raise soft money for issue advocacy may also set up a PAC. Most PACs represent businesses, such as the Microsoft PAC; labor, such as the Teamsters



PAC; or ideological interests, such as the Emily's List PAC or the National Rifle Association PAC.

NOTE: "Hard money" is from political donations that are regulated by law through the Federal Election Commission. "Soft money" is donated to political parties in a way that leaves the contribution unregulated.

**Super PACs** were created in 2010 following the outcome of a federal court case known as *SpeechNow.org v. Federal Election Commission*. Technically known as independent expenditure-only committees, Super PACs may raise unlimited sums of money from corporations, unions, associations and individuals, and then spend unlimited sums to overtly advocate for or against political candidates. However, Super PACs must report their donors to the Federal Election Commission similar to traditional PAC requirements. Unlike traditional PACs, Super PACs are prohibited from donating money directly to political candidates. According to OpenSecrets, as of April 07, 2014, 989 groups organized as Super PACs have reported total receipts of over $147 million and total independent expenditures of over $30 million so far during the 2014 election cycle.

Is there a Political Advocacy Group in your Sales District?

Go to http://www.opensecrets.org/influence/ for detailed information and to research various political influencers and lobbying groups.

### Key Take Aways:

1. Research the political advocacy groups in your area and determine the type of group and their mission. The OpenSecrets.org website will give you key information for these groups.
2. Contact these political advocacy groups and assist them in communicating their messages to targeted constituents (ex: Healthcare Reform, Immigration, etc.). Be sure to check CF! to ensure there is not an existing opportunity.
3. Develop a Customer Relationship Management Direct Mail program to track campaign donor communication and activity so that these groups touch their constituent multiple times.
4. Fund raising is critical to these groups – show them how to take advantage of the Digital Personalization or Emerging Technology promotions to drive donors to their websites and receive a discount on their mail.
5. Act now . . . Decisions are being made on media spending now for the rest of the election cycle, especially in battleground states.

For more information on selling political mail, please refer to Mailing Strategies on SFR at http://blue.usps.gov/sales/sales-organization/sop/strategy/mailing/strategies.htm



# Blue United States Postal Service
You deliver for the country, we deliver for you.



Search | Contact Blue | LiteBlue | Help | USPS.com

Monday, June 8, 2015

## National Postal Forum

### Background

The National Postal Forum Conference is the nation's preeminent mailing industry meeting. Each year, the conference brings together the Postal Service and its major customers — including corporations, state and local governments and nonprofit groups — for lively discussions on using the mail to boost business and generate revenue. Participants also learn about the latest marketing innovations and trends in the mailing industry.

The conference, which has been held each year since 1968, is an investment in the future of the Postal Service and its customers. The conference is run by a 501(c)(3) not-for-profit educational corporation called the National Postal Forum.

### Talking Points

**Bringing the Postal Service, Industry Leaders and Customers Together to Work Toward A Stronger Mailing Industry**

Since 1968, the National Postal Forum has been the preeminent mailing industry trade show, bringing leaders of the Postal Service and mailing industry together to share ideas and collaborate on new innovations to grow our nation's mail service.

- Last year's National Postal Forum was attended by more than 4,000 large and small business customers who represent companies that spent more than $22 billion in revenue last fiscal year — accounting for nearly a third of total revenue for the Postal Service in FY2012.
- The exhibit hall features the largest comprehensive gathering of suppliers to the Postal Service and the businesses involved in mail.

### Growing Revenue through Education, Innovation and Collaboration

The goal of the Postal Service at the National Postal Forum is to grow revenue by educating customers about its products and services as a strong marketing channel, and equipping industry leaders, who serve as an extended sales force for the USPS, with the latest innovations to help them market the mail to large and small businesses.

- Senior managers of the Postal Service also meet with industry customers to resolve mailer's issues, and the USPS sales force identifies and closes high-value revenue opportunities.
- Organized by a separate not-for-profit educational corporation, this once-a-year event presents a unique opportunity for existing and prospective customers to meet and interact with senior level USPS executives while also attending educational workshops conducted by industry and Postal Service mailing experts.

### Providing Educational Workshops Recognized by Major Companies for Continuing Education Opportunities

With an intensive program of educational workshops led by Postal Service executives, many companies across the country send employees to the National Postal Forum as part of their official continuing education programs.

- By leading several NPF workshops tailored to its diverse audience of mail creators, mail preparers, mail room managers, and mailing industry professionals, Postal Service officials cover a wide range of topics from ways to utilize mail to boost business and generate revenue to education on how to design and prepare mail for delivery.

http://blue.usps.gov/corpcomm/fact-sheets/national_postal_forum.htm

